## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| -------------------------------------- | X | |
| High 5 Games, LLC, | : | |
| Plaintiff, | : | |
| vs. | : | Case No.: |
| IGT, | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| -------------------------------------- | X | |

## <u>COMPLAINT</u>

Plaintiff High 5 Games, LLC, formerly known as PTT, LLC ("H5G"), by its attorneys, Greensfelder, Hemker & Gale P.C., as and for its complaint against Defendant IGT, alleges as follows:

## <u>NATURE OF THIS ACTION</u>

1.      This action arises from IGT's failure and refusal to cease distribution of certain wagering video games following its material breach of IGT's agreement with H5G and H5G's subsequent termination of that agreement. IGT has also failed to make certain payments owed under the now-terminated agreement, has failed to cease distribution of certain unauthorized, modified games, and has failed to abandon, cancel, or assign to H5G certain trademark filings for H5G game product names rightfully belonging to H5G but for which IGT holds pending trademark filings.  IGT's continued distribution of the games has caused injury and damage to

H5G and will unless enjoined continue to cause injury and damage to H5G. Among other harm, IGT's continued distribution of the games is causing irreparable harm to H5G's goodwill in the marketplace because H5G is deprived of its bargained-for contractual right on termination of the agreement for material breach to exclusivity in distribution of the H5G games at issue and instead distribution of these valuable game properties remains under the control of a disaffected former distributor. In addition, H5G is suffering irreparable harm because IGT is distributing unauthorized modified games which are of lower quality than H5G-authorized games. Further, H5G is unable to ascertain the full extent of this harm because IGT has not disclosed all unauthorized game properties to H5G and H5G continues to discover such unauthorized games in the marketplace. Finally, IGT remains in possession of certain of H5G's confidential information which on information and belief IGT is using to create unauthorized modified games. H5G has repeatedly raised with IGT its breaches of the parties' agreement, both before and during the cure period provided by contract, with no satisfactory response from IGT. By this action, H5G seeks to remedy these harms by recovery of substantial damages for payments owed to it by IGT, including advances and royalties and enhanced royalty rates owed on termination of the agreement, recovery of punitive and treble damages and attorney's fees as a result of IGT's willful conduct, and injunctive relief to prevent IGT's continued distribution of the games at issue and to require IGT to perform its contractual and other legal obligations to immediately deliver certain intellectual property related to the H5G games to H5G.

## THE PARTIES

2.      Plaintiff H5G is a Delaware Limited Liability Corporation with its principal place of business in New York.

3.      Defendant IGT is a Nevada corporation with its principal place of business in Nevada. IGT is a wholly owned subsidiary of International Game Technology.

## JURISDICTION AND VENUE

4.      The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

5.      The Court also has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) because this is a civil action arising under 15 U.S.C. § 1051 *et seq.* (federal trademark law).

6.      Venue is proper in this District because the parties agreed that any claims under their agreement would be subject to litigation in Cook County, Illinois.

## FACTS

### *GENERAL BACKGROUND ON THE PARTIES*

7.      H5G is a leading provider of high-quality, highly artistic video-style wagering games, both through third parties (who typically distribute H5G games through video reel slot machines and other, similar equipment) and through its own online casino.  With a handful of exceptions, H5G is the exclusive provider of H5G games via the online, social, and mobile channels of distribution ("OSM Channels").  H5G is widely known for producing games featuring beautiful graphics with meticulously layered artwork and innovative game play.  H5G creates and owns rights in names for each of its games and game features and is also the owner of all rights in the H5G mark (the "H5G Mark") which is registered in the United States and which H5G licenses to others, including IGT, in connection with distribution of H5G-authorized games.

8.      IGT has been and is currently one of the world's largest developers and distributors of computerized gaming equipment and software, especially for land-based use, *e.g.*, casino video slot machines.

## THE PARTIES' NOW-TERMINATED AGREEMENT

9.      H5G and IGT first entered into an agreement in 2003. Pursuant to that agreement and successive agreements, H5G provided to IGT certain games that it had created and developed for distribution by IGT as hosted on IGT's land-based video-style slot gaming machines. During the parties' business relationship, H5G produced many of IGT's highest-grossing casino games, including worldwide best sellers and industry-noted titles such as CATS, DAVINCI DIAMONDS, and GOLDEN GODDESS, among numerous others. As a result of having rights to distribute H5G Games, IGT catapulted to one of the world's leading distributors of video slot machine games.

10.     In 2011, as the parties' 2008 agreement was coming to its end, a dispute arose between H5G and IGT with regard to improper game distribution by IGT, among other issues. Upon information and belief, to avoid the stringent penalties that IGT would have faced under the 2008 agreement for its material breach, after nearly a year of settlement discussions, IGT offered to enter into a new agreement, which came to fruition in 2012.

11.     That agreement is entitled the Confidential Development and License Agreement entered into effective July 12, 2012 (the "2012 Agreement" or the "Agreement"). The Agreement generally governs H5G's provision of complete games (including for example titles, artwork, sound, and code providing functionality, such as animation, paytables and game features) to IGT, in exchange for advances and for royalty payments upon IGT's distribution of those games to casinos and other venues. The Agreement provided that, with the exception of ten (10) specific enumerated titles, H5G would have the exclusive rights to all H5G games produced prior to the Agreement for distribution in the OSM Channels.

12.     The Agreement also provided that IGT would own certain intellectual property rights in the games provided to it by H5G. In order to protect H5G's reputation and goodwill in

the marketplace and to permit H5G to exploit its rights in the games as contemplated, the Agreement placed express restrictions on IGT's ability to use that intellectual property.

*Restrictions on Derivative Works*

13.     Thus, the Agreement prohibits IGT from making modifications or alterations or creating derivative works of certain of the games provided to it by H5G (Accepted H5G Games, as defined in the Agreement) with an express exception for "Co-Developed Games." Agreement, § 4.3.2.

14.     The Agreement further provided that "Confidential Information" included, among other things, "designs," "specifications," "computer codes," "plans," "ideas," and "concepts" of a party to the Agreement, and provided that IGT could "use the Confidential Information [disclosed by H5G] solely for purposes of exercising its rights and obligations under this Agreement and not for any other use or purpose." Agreement, § 13.1.

15.     The Agreement thus clearly prohibited IGT from utilizing H5G's Confidential Information, or any other means, to create modified, or derivatives of, the specified H5G games.

*Co-Developed Games*

16.     Under the Agreement, IGT was granted a narrowly circumscribed right to create and distribute a "Co-Developed Game."

17.     As relevant here, the Agreement defines a Co-Developed Game as one which is created by IGT and which does not use H5G-created artwork, but which uses one of H5G's innovative "Game Features" as defined in the Agreement which had earlier been used in a game provided by H5G and accepted for distribution by IGT.   IGT's right to create and distribute Co-Developed Games was in all cases subject to the requirements of Section 4.3.2 and the payment of the applicable advances and royalties.  Agreement, § 4.2.2(ii).

18.     Under Section 4.3.2 of the Agreement, IGT could not "develop, market or distribute a Co-Developed Game without first notifying H5G thereof in writing."  Agreement, § 4.3.2.

19.     In other words, IGT could create its own games using H5G Game Features only upon providing proper notice and paying an advance and making required royalty payments to H5G.

*H5G's Rights to Distribute Games in the OSM Channels*

20.     Under the Agreement, H5G was granted  the exclusive rights to nearly all H5G-produced games produced prior to the 2012 Agreement, as well as to any Co-Developed games developed prior to the 2012 Agreement, for distribution in the OSM Channels, with the exception of ten (10) specific titles identified in the Agreement.  Agreement, § 5.1(i).

*Use of H5G's Mark Only on High-Quality Games*

21.     The Agreement provides that IGT must display the H5G Mark on the H5G games which it distributes and also on the Co-Developed Games.  To protect the H5G Mark and H5G's reputation and goodwill in the marketplace, the Agreement provided that IGT could use "the Trademarks or other relevant markings of [H5G] only in connection with high quality goods or services."  Agreement, § 9.2.1.

*Consequences of Termination of Agreement*

22.     The Agreement provided that, in the case of any material breach of the Agreement by IGT, followed by a period of 120 days in which IGT failed to cure its breach, H5G could terminate the Agreement.  Agreement, § 14.1.3.

23.     Upon such termination:

(a)     IGT was required to cease marketing and selling of the games at issue to sublicensees for all online, social, and mobile use and other "Wager Gaming Use," and to cease

all marketing and selling of the games at issue to end users for all online, social, and mobile uses within thirty (30) days of termination;

(b)     IGT was required to "assign to H5G all rights to the [intellectual property] originally assigned to IGT under [the Agreement];"

(c)     IGT's royalty rates due to H5G for games H5G delivered under the Agreement would double; and

(d)     H5G's royalty rates owed to IGT under the Agreement would be cut in half.  Agreement, § 14.1.5(B).

*Remedy for Breach*

24.     H5G bargained for these provisions on termination for material breach including, importantly, the requirement that IGT cease distribution of games because it was critical to H5G that following termination it have sole and exclusive control over distribution of its games in the OSM Channels.  To make this contractual protection and other contractual protections effective, the Agreement further provides that breach of the Agreement by IGT would provide the basis for injunctive relief.  Agreement, § 13.5.

## IGT'S REPEATED BREACHES OF THE AGREEMENT LEADING TO TERMINATION

*IGT's Distribution of 17 Games Featuring H5G's Mark Without Notice to H5G and Without Payment of Contractually Required Advances and Appropriate Royalties*

25.     As noted, the Agreement permitted IGT to create "Co-Developed Games" that were unrelated to existing H5G games but which incorporated one of the "Game Features" innovated by H5G.  The Agreement required, however, that IGT give notice to H5G of its intent to create and release these Co-Developed Games and that IGT pay an advance against royalties due on the games, in addition to ongoing royalties.

26.     Through diligence in the marketplace, H5G discovered that IGT created seventeen (17) games which met the definition of Co-Developed Games in that they incorporated an H5G Game Feature but as to which IGT had not provided the required notice to H5G and had not paid the required advance or royalties.  Each of these 17 games is distributed displaying the H5G Mark.  *See* Appendix A.

27.     In or about June 2014, H5G informed IGT that it had not complied with its contractual obligations regarding distribution of these 17 games including making the required payments to H5G for the games.

28.     In response to H5G's concern, IGT began to pay royalties on these games but at a lower royalty rate than was applicable to the games under the Agreement, and IGT failed to pay the contractually required advances due to H5G for these games.

29.     Thus, IGT has breached and remains in breach of its obligation to pay both required royalties and advances.  IGT's continued distribution of these games, where IGT has failed to give the required notice and pay the required amounts, is therefore unauthorized under the Agreement.  As such, the continued use of the H5G Mark on the games is unauthorized and constitutes trademark infringement.

30.     H5G has been especially harmed by IGT's failure to pay the required advances on these 17 games and the other Co-Developed Games discussed below since, as a relatively smaller company, it depends on the bargained for cash flow which the advances provide in order to continue its development and marketing efforts without incurring additional debt and interest obligations.

*IGT's Distribution of 64 Games Incorporating an H5G Game Feature Without Notice to H5G and Without Payment of Contractually Required Advances and Royalties*

31.     Through diligence in the marketplace, H5G also discovered that IGT created dozens of "Co-Developed" games which, unlike the 17 games enumerated above, do not bear the H5G Mark despite their incorporation of an H5G Game Feature.

32.     The Agreement contains a nonexclusive listing of Game Features:  "Split Symbols," "SuperStacks," and "Tumbling Reels."  Agreement, § 1 (definition of "H5G Game Feature").

33.     IGT has created and distributed at least 14 games that employ these three Game Features without notice to H5G and without paying advances or royalties on the games.

34.     The Agreement also lists several other recognized Game Features.  *See* Agreement, App'x F.  These include Scatter Bucks and Respin and Repay.

35.     IGT has created and distributed at least 22 games that employ these two Game Features without notice to H5G and without paying advances or royalties on the games.

36.     In addition, H5G has innovated a number of other Game Features not enumerated in the Agreement's nonexclusive list.  These include:

- Horizontal Expanding Symbols, in which a designated symbol, upon appearing in the matrix of play, "expands" horizontally (*i.e.*, comes to be repeated along a horizontal line of gameplay);

- Locking Symbols (aka Locking Wilds), in which upon the appearance of a designated symbol, that symbol (but not its entire reel) is locked into place for a subsequent spin; and

- Wild Multipliers, in which a winning combination that includes a "wild" symbol is multiplied by a depicted multiplier amount.

37.     IGT has created at least 28 games that incorporate these three additional Game Features without notice to H5G and without paying advances or royalties on the games.  Thus, in

total, IGT has created at least 64 games that incorporate H5G Game Features without the contractually required notice to H5G and without paying required advances or royalties.

38.     Upon information and belief, the advances and royalties that IGT has failed to pay H5G for games distributed by IGT that employ H5G Game Features total tens of millions of dollars.

39.     With respect to games that IGT has been distributing without notice and payment to H5G, H5G has been unable to determine the full scope of IGT's breach because the use of H5G Game Features can be confirmed only during game play and H5G does not have access to IGT's library of hundreds of games and thus IGT's games are not readily available for H5G to test.  However, given IGT's repeated failures to notify H5G of such games, it is likely that many more exist.  Thus the harm to H5G continues without an effective means for H5G to take action to remedy or prevent that harm.

40.     H5G has been harmed by IGT's failure to pay the required advances for each of the 64 games discussed above since, as noted, it depends on the bargained for cash flow which the advances provide in order to continue its development and marketing efforts without incurring additional debt and interest obligations.  H5G has also been harmed by IGT's failure to pay royalties on these 64 games.  Upon information and belief, the magnitude of royalties owed would be greater than the amount of the advance due for most of these games.

41.     In addition to IGT's failure to pay advances and required royalties for the games, IGT also has failed to provide to H5G deliverables that would enable H5G exercise its online, social, and mobile rights to such of the games as were developed prior to the 2012 Agreement.

*IGT's Improper Creation of Derivative Works*

42.     As noted, the Agreement circumscribed the manner in which, upon notice to H5G, IGT was permitted to create and distribute "Co-Developed Games" which would result in

contractually required payments to H5G. Any other modifications to H5G games or otherwise created derivative works were strictly prohibited.

43.     The Agreement's prohibition on modification precluded IGT from taking an existing H5G game and modifying it, for example, by changing the name, adding art, and marketing it as a new game. This prohibition was designed to prevent IGT from creating and distributing low-quality versions of H5G games, including purported "sequels" thereof or versions with distorted graphics, which would harm H5G's reputation and lessen the demand for the original title. The Agreement's restrictions were specifically bargained for by H5G to ensure that H5G would retain control and oversight over the appearance and quality of the games in the marketplace and thus would be able to maintain its reputation for producing high-quality products and its position as one of the most sought-after game developers.

44.     Notwithstanding the provisions in the Agreement, unbeknownst to H5G, on information and belief, IGT created more than thirty (30) video reel slot wagering games that included modifications to H5G's games and which were marketed by IGT as new games. *See* Appendix C.

45.     Upon information and belief, IGT was able to create these games by misusing Confidential Information of H5G, namely the source art and other files corresponding to the H5G game that formed the basis for the derivative game.

46.     Unlike the deliverables that H5G provided to IGT in the ordinary course when delivering games, source art was ordinarily not provided to IGT. The source art files comprise a complete digital package that enable the recipient to make underlying modifications to the layers provided within the art.  H5G provided these source files only because IGT requested them in advance of industry trade shows. IGT justified these requests by advising H5G that the files

were needed in order to create promotional materials to advertise the H5G games being distributed by IGT and which the parties thus had a mutual interest in promoting.

47.     Prior to sending the source art files, H5G clearly identified them as confidential information.

48.     IGT misused these confidential source art files by using them to create unauthorized modified, and derivatives of, H5G games.  For example, in September 2013, IGT first marketed and displayed a game entitled "Dangerous Beauty 2" which was in fact an impermissibly modified version of H5G's "Dangerous Beauty" authorized game.

49.     When H5G discovered this "sequel" game and brought it to IGT's attention in or about February 2014, IGT subsequently represented that it created only two "sequels."  On information and belief, this communication was intended to convey to H5G that IGT had not, and would not, create and distribute any other "sequels."

50.     In fact, H5G has discovered that IGT has created at least six "sequels" among the thirty-one impermissible modified games.

51.     These thirty-one impermissible versions of H5G game properties employ the same game titles (with slight variations or "sequel" numbers) as the original H5G games, display the H5G Mark, and generally employ the same characters, art, and Game Features.  However, they are inferior to the actual games that H5G creates and releases into the marketplace, for two reasons.

52.     First, some of the modified versions include shoddy design that is below H5G standards, including the placement of distracting symbols near H5G's character art and the application of improper dimension ratios when shrinking or reformatting the artwork in the games to accommodate the modifications.

53. Second, the current games that H5G produces (with ever-evolving graphics technology) are of substantially higher quality than those produced even a few years ago. Releasing a purported "new" H5G game, which employs old graphics and design, thus harms H5G's brand and its reputation for offering cutting-edge graphics and design.

54. IGT did not inform H5G that it created these unauthorized modified games (as it would have been required to, via the contractual requirements for providing notice and an advance, if these were Co-Developed Games). Instead, H5G learned of them only through its own diligence in the marketplace.

55. H5G has confronted IGT about these unauthorized games but IGT has refused to cease distribution of them, agreeing only that it would continue paying royalties to H5G. Continued payment of royalties does not prevent the harm to H5G's goodwill and reputation in the marketplace for its association with these inferior versions of its games.

56. Moreover, H5G has not been able to confirm that IGT has paid royalties to H5G for these games due to the accounting practices followed by IGT in reporting royalties.

57. Specifically, IGT's impermissible modified games bear titles similar to the corresponding original H5G game. Upon information and belief, IGT may have included payments related to some of the unauthorized modified games on its royalty reports using nearly identical labels as were used for the corresponding original H5G games, thus masking the existence of the totality of unauthorized games from H5G. While H5G has audit rights under the Agreement, those rights are exercisable only once per year and were delayed by the complexity of the audit process and IGT's failure to fully and timely cooperate in the audit process, leaving H5G with no practical way to have discovered the unauthorized distribution from the alleged royalty payments alone.

58.     H5G has been harmed by IGT's distribution of these impermissibly modified games. As noted, the games feature shoddy design and reflect old graphics in "new" games. As such, their presence in the marketplace—bearing the H5G Mark, and bearing titles associated with well-known existing H5G games—harms H5G's reputation and goodwill in the marketplace.

*IGT's Conversion of Certain of H5G's Trademarks*

59.     In the course of its relationship with IGT, H5G disclosed to IGT the names H5G had created for use with certain game products ("Game Trademarks") which were under development by H5G. H5G, however, never presented to IGT the game concepts related to these Game Trademarks and thus IGT has never had any right or interest in these game concepts or the related Game Trademarks.

60.     Without notice to H5G, IGT submitted to the United States Patent and Trademark Office ("USPTO") intent-to-use trademark applications for the Game Trademarks. Upon information and belief, IGT filed these applications with knowledge that the Game Trademarks belonged to H5G and unless and until H5G presented the related game concept, IGT would have no right or interest in the Game Trademarks.

61.     The game concepts were never presented to IGT and IGT has never developed a product or used any of the Game Trademarks in connection with any product offered in commerce with one exception discussed below. In order to maintain the trademark applications, IGT periodically submitted statements to the USPTO under penalty of perjury representing that it had a continuing bona fide intention to use the Game Trademarks and representing for example that it was continuing to engage in "product or service research or development" to explain its delay in beginning actual use of the Game Trademarks.

62.     In or about November 2012, H5G notified IGT that the Game Trademarks were the property of H5G, and an IGT employee acknowledged in writing to H5G that "[t]he trademarked games have been committed to IGT competitors and [are] not available for us to sell." IGT legal counsel also acknowledged that an outstanding issue between the parties was "assignment of trademark applications to H5G."

63.     Nevertheless, IGT failed to abandon the applications for the Game Trademarks or assign them to H5G.    IGT's original applications for some of the Game Trademarks subsequently became abandoned because IGT was unable to submit proof to the USPTO that it was using those Game Trademarks within the required time period for proving use. With respect to certain of the Game Trademarks, however, in order to perpetuate its wrongful dominion over these Marks, in 2013 and 2014, IGT filed new intent-to-use applications for FOXY DYNAMITE, HAVANA NIGHTS, KINGS OF GILBRALTER, and WHITE LION, again representing that it had a bona fide intention to use the marks in commerce.  In those new applications, IGT further falsely represented in a sworn statement that "no other person, firm corporation or association has the right to use the mark in commerce . . . ." In addition, with respect to one of the Game Trademarks, MYSTERY BUCKS, IGT has begun using the mark and has been issued a registration for the mark. Upon information and belief, IGT originally filed the applications for the Game Trademarks and re-filed certain of the Game Trademarks in order to obtain leverage over H5G in the parties' negotiations during the pendency of the Agreement.

64.     H5G has filed applications with the USPTO to register the Game Trademarks including as relevant here EMPRESS OF TIME, FOXY DYNAMITE, HAVANA NIGHTS, KINGS OF GIBRALTAR, MYSTERY BUCKS, RESPIN ON WIN, THE BIG CHASE, and WHITE LION and has been using at least two of the Game Trademarks in commerce, namely

FOXY DYNAMITE and MYSTERY BUCKS, in connection with offering a game product. As a result of IGT's wrongful filing and re-filing of certain of the Game Trademarks, H5G's applications for HAVANA NIGHTS, KINGS OF GIBRALTAR and WHITE LION have been suspended by the USPTO pending disposition of IGT's prior filed applications.

65.     To date, despite repeated demands by H5G, IGT has failed and refused to assign the Game Trademarks applications and registration to H5G, or in the alternative, abandon or cancel them, thus unlawfully and unfairly interfering with H5G's rights in and ability to fully exploit the Game Trademarks.

*THE AGREEMENT IS TERMINATED AND IGT BREACHES*
*ITS OBLIGATIONS UPON TERMINATION*

66.     Based on the foregoing events and after undertaking an audit in an effort to learn the scope of IGT's improper course of conduct, on June 10, 2014, pursuant to Section 14.1.3 of the Agreement, H5G sent IGT a letter formally placing IGT on notice of material breaches of the Agreement, namely, its creation of would-be Co-Developed Games without notice to H5G and failure to pay required advances and royalties, its distribution of unauthorized derivative works, and its conversion of H5G's trademarks.

67.     As required by the Agreement, the June 10, 2014 letter provided for a period of time within which IGT would be able to attempt to cure its multiple breaches; that period was set to expire on October 8, 2014 without cure by IGT.

68.     In a show of good faith, H5G twice extended the cure period after IGT purported that it was interested in curing its breaches. The second and final extension extended the cure period to December 8, 2014. IGT failed to cure its material breaches (except, as noted, its partial cure with respect to the seventeen (17) games by paying partial royalties on those games).

69.     On January 20, 2015, H5G sent a letter giving notice to IGT pursuant to Section 14.1.3 that the Agreement had been terminated as a result of IGT's failure to cure its breaches prior to the end of the extended cure period.

70.     Under the express terms of the Agreement, H5G's January 20 notice immediately triggered certain obligations by IGT including:  the cessation within 30 days, specifically no later than February 19, 2015, of IGT's marketing and sales of any H5G content (including without limitation the ten (10) games allocated to IGT under the Agreement for distribution in the OSM Channels) and the assignment back to H5G of all of H5G's intellectual property rights that had previously been assigned to IGT under the Agreement.

71.     When IGT ceases its marketing and sales of H5G content in the OSM Channels, H5G will become the exclusive provider of high-quality H5G content in this space.  This is a valuable right that H5G specifically bargained for in the event of material breaches by IGT.

72.     IGT has denied that it is in breach, denied that the Agreement is terminated, and refused to comply with its obligations upon termination.

73.      H5G faces the imminent and irreparable harm of, rather than being the exclusive provider of its own content in the OSM Channels, sharing those markets with a disaffected former distributor with the opportunity and motivation to harm H5G by failing to properly exploit the content (especially given the fact that IGT distributes competitive games it has obtained from other game developers).  Regaining control now is critical: H5G's games are depreciating assets, and over time consumers of online, social, and mobile gaming will gravitate to newer games.  Exclusive control over H5G content online ensures that H5G can continue to build and enhance its reputation as a developer and distributor of high-quality gaming properties.

Thus time is of the essence in respect of H5G becoming the sole source of these sought-after games.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

74.     H5G repeats and realleges the allegations contained in paragraphs 1 through 73 as though fully set forth herein.

75.     The Agreement is a valid and enforceable contract.

76.     Defendant breached the Agreement, among other ways, as follows:

(a)     Defendant has failed to pay advances with respect to the games listed in Appendices A and B;

(b)     Defendant has failed to pay required royalties with respect to the games listed in Appendices A and B;

(c)     Defendant has created impermissible derivative works of existing H5G games in violation of the Agreement (*see* Appendix C);

(d)     Defendant has used H5G's Confidential Information for impermissible uses, namely, creating games that constitute derivative works of existing H5G games (*see* Appendix C);

(e)     Defendant has used the H5G Mark on unauthorized games that are not high-quality, namely those listed in Appendix C;

(f)     Defendant has failed to cease marketing and selling H5G games, despite the termination of the Agreement;

(g)     Defendant has failed to assign to H5G the intellectual property initially assigned to IGT under the Agreement, despite the termination of the Agreement; and

(h)     Defendant has failed to pay double the existing royalty rates, as required upon termination of the Agreement.

77.     H5G has been irreparably harmed by these breaches and will continue to suffer irreparable harm unless and until IGT is enjoined.  In addition, H5G has suffered monetary damages in an amount to be proven.

78.     A monetary remedy cannot adequately compensate H5G and thus specific performance of the Agreement is warranted.

**SECOND CAUSE OF ACTION**
**(Trademark Infringement – Unauthorized Use of H5G Mark)**

79.     H5G repeats and realleges the allegations contained in paragraphs 1 through 78 as though fully set forth herein.

80.     H5G is the owner of the entire right, title, and interest in and to the H5G mark and owns a valid and subsisting U.S. Registration for that mark, No. 39,70506 broadly covering the design and development of computer programs and video games for others.

81.     Defendant has used the H5G Mark on and in connection with distribution and sale of the games listed in Appendices A and C without authorization or permission from H5G.

82.     Defendant's use of the H5G Mark infringes H5G's exclusive rights in the H5G Mark and is likely to cause confusion and to cause the relevant public to mistakenly believe that Defendant's games emanate from, are authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with H5G in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

83.     Defendant's acts are without license from or permission of H5G.

84.     Defendant's acts have been undertaken with full knowledge of H5G's rights in the H5G Mark.

-19-

85.     Defendant's conduct challenged herein was malicious, deliberate and willful.

86.     H5G has suffered irreparable harm as a result of these violations of law by Defendant, and will continue to suffer irreparable harm for these violations for which there is no adequate remedy at law.

87.     In addition, H5G has suffered monetary damages in an amount to be proven at trial, including without limitation disgorgement of any and all of IGT's unlawful profits and unjust enrichment and, because Defendant's conduct is willful, H5G is entitled to recover treble damages and attorney's fees.

**THIRD CAUSE OF ACTION**
**(Unfair Competition)**

88.     H5G repeats and realleges the allegations contained in paragraphs 1 through 87 as though fully set forth herein.

89.     H5G owns the Game Trademarks including as relevant to this claim the Game Trademarks listed in Appendix D.

90.     Defendant intentionally interfered with H5G's rights in these trademarks by exerting dominion and control over them when it filed applications to register the Game Trademarks and subsequently failed to abandon, cancel, or assign the trademark applications and registration on demand by H5G.

91.     Defendant's interference was in bad faith and intended to benefit Defendant by, among other things, creating leverage in ongoing negotiations between the parties over royalty rights and other matters during the pendency of the Agreement.

92.     Defendant's interference deprived H5G of unencumbered title to the Game Trademarks, has prevented in part H5G's ability to obtain its own registrations for certain of the

Game Trademarks, and has hampered H5G's ability to fully and freely exploit the Game Trademarks.

93.    H5G has suffered irreparable harm as a result of these violations of law by Defendant, and will continue to suffer irreparable harm for these violations for which there is no adequate remedy at law.

94.    H5G has suffered damages as a result of IGT's wrongful assertion of ownership over the Game Trademarks in an amount to be proven.

## DEMAND FOR JURY TRIAL

H5G hereby demands a trial by a jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff High 5 Games LLC demands judgment:

(i)    on its First Cause of Action, awarding preliminary and permanent injunctive relief, specific performance by IGT of its relevant obligations under the Agreement, and damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees;

(ii)    on its Second Cause of Action, awarding preliminary and permanent injunctive relief and damages, treble damages and attorney's fees in an amount to be determined at trial, plus interest and reasonable costs;

(iii)    on its Third Cause of Action, awarding preliminary and permanent injunctive relief and damages and punitive damages in an amount to be determined at trial, plus interest, reasonable costs, and attorneys' fees; and

(iv)    granting such other and further relief as the Court deems just and proper.

Dated: March 10, 2015                              Respectfully submitted,


                                                   By:/s/Courtney A. Adair

                                                       Of Counsel:
                                                       COOLEY LLP
                                                       Janet Cullum
                                                       Michael Berkovits
                                                       1114 Avenue of the Americas
                                                       New York, NY  10036
                                                       (212) 479-6000

                                                       Kara E. F. Cenar (ARDC 6198864)
                                                       Kcenar@greensfelder.com
                                                       Courtney A. Adair (ARDC 6928188)
                                                       Cadair@greensfelder.com
                                                       Greensfelder, Hemker & Gale, P.C.
                                                       200 South Madison Street
                                                       Suite 2700
                                                       Chicago, IL  60606
                                                       312.345.5087
                                                       312.419.1930 (Fax)

## APPENDIX A

### Seventeen Games That Use an H5G Game Feature and Display the H5G Mark

| Title | Game Feature Used |
|---|---|
| Autumn Queen | Super Stacks |
| Autumn Queen 2 | Super Stacks |
| Knights Unite | Super Stacks |
| Montezuma | Super Stacks |
| Savannah Princess | Split Symbols |
| Spring Queen | Super Stacks |
| Spring Queen 2 | Super Stacks |
| Summer Queen | Super Stacks |
| Summer Queen 2 | Super Stacks |
| The Golden King | Super Stacks |
| The Temple of Zeus 2 | Super Stacks |
| Tiki Princess | Split Symbols |
| Way of Shogun | Super Stacks |
| Wild Princess | Split Symbols |
| Wild Princess 2 | Split Symbols |
| Winter Queen | Super Stacks |
| Winter Queen 2 | Super Stacks |

## APPENDIX B

**Sixty-Four Games That Use an H5G Game Feature and Do Not Display the H5G Mark**

| Title | Game Feature Used |
|---|---|
| Isis | Split Symbols |
| Venture to Never Isle Duo | Split Symbols |
| In Bloom | Split Symbols |
| Splitting Hares | Split Symbols |
| Monopoly Dream Life | Tumbling Reels |
| Nouveau Riche | Tumbling Reels |
| Transformers Battle of Cybertron | Tumbling Reels |
| Sex and the City Fabulous! MultiPLAY | Tumbling Reels |
| Wheel of Fortune Big Money | Tumbling Reels |
| Wheel of Fortune Big Money Multi-Play | Tumbling Reels |
| Wheel of Fortune Big Money Bingo | Tumbling Reels |
| Greenback Attack Dynamic Dollars Spinning Reel | Scatter Bucks |
| Greenback Attack Wild Peppers Spinning Reel | Scatter Bucks |
| Greenback Attack Safari Flowers Spinning Reel | Scatter Bucks |
| Greenback Attack Thunderbolt 7s Spinning Reel | Scatter Bucks |
| Cougarlicious Video Game | Horizontal Expanding Symbols |
| Cougarlicious Video Reel | Horizontal Expanding Symbols |
| Crystal Fortunes Fire Diamonds Video Reel | Horizontal Expanding Symbols |
| Dakota Thunder Video Game | Horizontal Expanding Symbols |
| Dakota Thunder Video Reel | Horizontal Expanding Symbols |
| Diamond Galaxy Video Reel | Horizontal Expanding Symbols |
| Fire Diamonds Video Reel | Horizontal Expanding Symbols |
| Fortune Hunter Video Slots | Horizontal Expanding Symbols |
| Miss Red Video Game | Horizontal Expanding Symbols |
| Miss Red Video Slots | Horizontal Expanding Symbols |
| Miss White Video Slots | Horizontal Expanding Symbols |
| Paradise Garden Bingo | Horizontal Expanding Symbols |
| Paradise Garden Video Game | Horizontal Expanding Symbols |
| Paradise Garden Video Reel | Horizontal Expanding Symbols |
| Money Comb Video Reel | Respin and Repay |
| Shinobi Video Reel | Respin and Repay |
| Heart of Africa | Respin and Repay |

| Title | Game Feature Used |
|---|---|
| Alice's Adventures in Wonderland Video Reel | Respin and Repay |
| Elephant King Video Reel | Respin and Repay |
| Red Hot Respin Double Diamond Slots | Respin and Repay |
| Red Hot Cherry Free Games 3D Spinning | Respin and Repay |
| Red Hot Cherry Free Games Spinning Reel | Respin and Repay |
| Wild Bill Video Reel | Respin and Repay |
| Jewel of the Arts | Respin and Repay |
| Skyrocket 7s Spinning Reel | Respin and Repay |
| Super Happy Fortune Cat Video Reel | Respin and Repay |
| Triple Double 7 & 7 Spinning Reel | Respin and Repay |
| Wheel of Fortune Special Edition Video Reel Money Spin | Respin and Repay |
| Luck Of The Lemur Slots | Respin and Repay |
| Magic Diamond Slots | Respin and Repay |
| Rocket City Bonanza Video Slots | Respin and Repay |
| ELVIS Multi-Strike Video Reel | Respin and Repay |
| Ghostbusters Video Reel | Locking Wilds, aka Locking Symbols |
| Star Wars - The Empire Strike Back Video Reel | Locking Wilds, aka Locking Symbols |
| Wilds Gone Wild Video Reel | Locking Wilds, aka Locking Symbols |
| Spirit of the Bear | Locking Wilds, aka Locking Symbols |
| Bells of Ireland 3-Reel MultiPLAY | Locking Wilds, aka Locking Symbols |
| Bonus Bells Free Games Spinning Reel | Locking Wilds, aka Locking Symbols |
| Diamond Queen Video Reel | Locking Wilds, aka Locking Symbols |
| Ocean Pearl Video Reel | Locking Wilds, aka Locking Symbols |
| Penny Palace Video Reel | Locking Wilds, aka Locking Symbols |
| Frog Princess Video Reel | Locking Wilds, aka Locking Symbols |
| Godzilla on Monster Island Video Slots | Locking Wilds, aka Locking Symbols |
| Huevocartoon Video Slots | Locking Wilds, aka Locking Symbols |
| Jukebox 4 Tunes | Super Stacks |
| Jade Fortune | Super Stacks |
| Double Bungah! Video Reel | Wild Multipliers |
| Wheel of Fortune Lucky 7s Slots | Wild Multipliers |

**APPENDIX C**

**Thirty-One Impermissible Derivatives**

| Title of Derivative Game | Title of Original Game |
|---|---|
| Ancient Arcadia Bingo | Ancient Arcadia |
| Black Widow 2 | Black Widow |
| Cats MultiPLAY Bingo | Cats and Cats MultiPLAY |
| Da Vinci Diamonds 2 | DaVinci Diamonds |
| Dakota Thunder | Thundering Buffalo |
| Dangerous Beauty 2 Video Slots | Dangerous Beauty |
| Dangerous Beauty Bingo | Dangerous Beauty |
| Double Dinosaur Bingo | Double Dinosaur |
| Figaro Bingo | Figaro |
| Goddess of Gold | Golden Goddess |
| Jaguar Princess Bingo | Jaguar Princess |
| Lion Heart Bingo | Lion Heart |
| Majestic Sea Bingo | Majestic Sea |
| Midnight Eclipse 2 | Midnight Eclipse |
| Midnight Eclipse Bingo | Midnight Eclipse |
| Noah's Ark Bingo | Noah's Ark |
| Old Money Bingo | Old Money |
| Port Royale Bingo | Port Royale |
| Prince of Lightning Bingo | Prince of Lightning |
| Princess of Paradise Bingo | Princess of Paradise |
| Secret Lagoon Bingo | Secret Lagoon |
| Shadow of the Panther 2 | Shadow of the Panther |
| Shadow of the Panther Bingo | Shadow of the Panther |
| Tango De Oro Bingo | Tango De Oro |
| The Mighty Atlas Bingo | The Mighty Atlas |
| Thundering Buffalo Bingo | Thundering Buffalo |
| Twin Win Bingo | Twin Win |
| Vanishing Act Bingo | The Vanishing Act |
| Vivaldi's Seasons Bingo | Vivaldi's Seasons |
| White Orchid 2 Video Game | White Orchid |
| Witches Riches Bingo | Witches Riches |

**Appendix D**

**Game Trademarks Which IGT Failed and Refuses to Assign to H5G**

| Titles |
| --- |
| Empress of Time |
| Foxy Dynamite |
| Havana Nights |
| Kings of Gibraltar |
| Mystery Bucks |
| Respin on Win |
| The Big Chase |
| White Lion |