IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HIGH 5 GAMES, LLC,              )
                                )
        Plaintiff,               )
                                )
    v.                           )  No. 15 C 2133
                                )
INTERNATIONAL GAME               )
TECHNOLOGY,                      )
                                )
        Defendant.               )

MEMORANDUM OPINION AND ORDER

A developer of casino games, High 5 Games, LLC ("H5G"), has sued one of its distributors for breach of contract, trademark infringement, unfair competition, and deceptive trade practices. The distributor, International Game Technology ("IGT"), has filed a partial motion to dismiss H5G's ten count complaint.

For the reasons stated below, I grant IGT's motion only as to the portion of H5G's unfair competition claim (Count IX) premised on alleged trademark misappropriation.

I.

At the motion to dismiss stage, I must accept H5G's factual allegations as true and draw all reasonable inferences in its favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

H5G develops "video-style wagering games" and distributes them in its own online casino and through third parties. Dkt.

No. 25 ("Am. Compl.") at ¶ 14. H5G is the exclusive distributor of its games through online, social, and mobile channels ("OSM channels"). *Id.* IGT is a developer and distributor of computerized gaming equipment and software commonly found in land-based casinos. *Id.* at ¶ 15.

In 2003, H5G contracted with IGT to provide games for distribution in land-based casinos. *Id.* at ¶ 16. The parties entered into successive agreements on similar terms. *Id.* In 2011, however, H5G accused IGT of "improper game distribution" and other contractual breaches. *Id.* at ¶ 17.

The parties resolved their differences and entered into a new three-year Confidential Development and License Agreement ("Agreement") on July 12, 2012 that required H5G to deliver at least thirty-four new games to IGT in exchange for advances and royalty payments. *Id.* at ¶ 18 and Ex. A at § 2.1. With the exception of ten enumerated games, H5G retained the exclusive right to distribute in OSM channels all games it had produced prior to execution of the Agreement. *Id.* at ¶¶ 18, 28.

Under the Agreement, IGT owns intellectual property rights in games provided by H5G subject to certain restrictions on use. *Id.* at ¶ 19. IGT, for example, is authorized to use "confidential information" disclosed by H5G only "for purposes of exercising its rights and obligations under the Agreement." *Id.* at ¶ 22. The Agreement expressly prohibits IGT from

modifying, altering, or creating derivative works from certain games provided by H5G except with respect to "Co-Developed Games." *Id*. at ¶¶ 21, 52-55. A Co-Developed Game incorporates features from a casino game that H5G had previously provided to IGT for distribution. *Id*. at ¶ 25. The Agreement authorizes IGT to create Co-Developed Games provided that it notifies H5G in writing; pays contractually specified advances and royalties; and displays the H5G mark on the game(s). *Id*. at ¶¶ 24-26, 29, 34.

About two years into the Agreement, H5G learned that IGT had distributed seventeen Co-Developed Games without notifying H5G or paying the contractually required advances or royalties. *Id*. at ¶ 35. H5G notified IGT of the seventeen Co-Developed Games for which advances or royalties were owed and demanded payment. *Id*. at ¶ 36. IGT started to pay royalties on the games at issue, "but at a lower royalty rate than was applicable...under the Agreement." *Id*. at ¶ 37. IGT also failed to pay the contractually required advances for the seventeen Co-Developed Games that H5G had discovered in the marketplace. *Id*. at ¶ 37.

Around the same time, H5G discovered that IGT had created sixty-four additional Co-Developed Games that did not bear the H5G Mark. *Id*. at ¶¶ 40, 46. IGT allegedly owes H5G tens of

millions of dollars in advances and royalties for these sixty-four Co-Developed Games.  *Id*. at ¶ 47.

The next contractual breach described in H5G's complaint is IGT's creation of more than thirty derivative games from the source art files for previously provided H5G games.  *Id*. at ¶¶ 56-57.  IGT allegedly induced H5G to disclose the underlying source art files on the pretense that IGT needed them to create promotional materials for industry trade shows.  *Id*. at ¶ 58.  IGT's derivative games display the H5G mark and employ the same titles, characters, and features as H5G's games, but "feature shoddy design and reflect old graphics in 'new' games," thereby harming H5G's reputation.  *Id*. at ¶¶ 63-65, 70.  IGT has agreed to pay H5G royalties for these derivative games, but refuses to stop distributing them.  *Id*. at ¶ 67.  In fact, IGT has introduced nine new derivative games since H5G terminated the Agreement.  *Id*. at ¶ 71.

H5G also accuses IGT of trademark conversion.  Before the Agreement was terminated, H5G disclosed to IGT the names of certain games that were still under development, but not the underlying game concepts.  *Id*. at ¶ 72.  IGT then filed intent-to-use applications on H5G's trademarks for several games still in development.  *Id*. at ¶ 73.  With one or two exceptions, IGT has not used any of those trademarks in connection with a product offered in commerce, but has repeatedly represented to

4

the U.S. Patent and Trademark Office ("USPTO") that it intends to do so. *Id*. at ¶¶ 74, 77-79. The USPTO has suspended at least three of H5G's trademark applications because of IGT's previously filed intent-to-use applications on those same marks. *Id*. at ¶ 80.

On June 10, 2014, H5G notified IGT of the alleged contractual breaches described above, which triggered a 120 day cure period under the Agreement. *Id*. at ¶ 82. H5G maintains that IGT did not cure any of the breaches even though it made partial royalty payments on seventeen Co-Developed Games. *Id*. at ¶ 84.

H5G formally terminated the Agreement on January 20, 2015. *Id*. at ¶ 85. Upon termination, IGT was required to stop marketing or selling any H5G content and assign back to H5G all of H5G's previously assigned intellectual property rights. *Id*. at ¶ 87. IGT did not comply with these obligations, denied breaching any of its contractual obligations, and challenged the validity of H5G's purported termination of the Agreement. *Id*. at ¶ 88.

H5G now asserts breach of contract claims against IGT based on: seventeen Co-Developed Games for which IGT has not paid contractually required advances and royalties (Count I); sixty-four additional Co-Developed Games for which IGT refuses to pay advances or royalties (Count II); thirty-one games impermissibly

derived from existing H5G games before the Agreement was terminated and nine derivative games created during the post-termination period (Count III); IGT's alleged misuse of H5G's confidential information to create derivative games (Count IV); and IGT's use of the H5G mark on derivative games (Count V). H5G also seeks a declaration that it lawfully terminated the Agreement (Count VI) and accuses IGT of violating the Agreement's post-termination provisions (Count VII).  Finally, H5G asserts claims for trademark infringement (Count VIII), unfair competition (Count IX), and deceptive trade practices (Count X).

II.

IGT has filed a partial motion to dismiss that raises five main arguments: (1) IGT has paid the contractually required royalties on the seventeen Co-Developed Games at issue in Count I; (2) the Agreement authorizes IGT to create thirty-one of the allegedly derivative games at issue in Counts III and IV; (3) the Agreement prohibits H5G from obtaining treble damages for trademark infringement; (4) H5G has no property rights in the five marks at issue in Count IX and cannot plausibly allege that consumer confusion is likely; and (5) H5G's deceptive trade practices claim sounds in fraud and has not been pled with sufficient particularity.

6

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

A.

IGT argues that Count I should be dismissed because H5G admitted in pre-suit correspondence attached to the complaint that IGT cured any breach with respect to advances and royalties owed on the seventeen Co-Developed Games at issue.

In a letter to IGT dated June 10, 2014, H5G identified seventeen games that allegedly constituted "Co-Developed Games" under the Agreement and demanded that IGT pay a minimum of $2,550,000 in "royalty advances"--i.e., $150,000 per game--within sixty days. Dkt. No. 25-2 at 1-2. H5G also noted that it had not received "a reporting of sales for each game" or "any additional royalties that H5G may be owed for such games." *Id*. at 1.

H5G acknowledges that IGT started to pay royalties on the seventeen Co-Developed Games at issue, but argues that IGT's payments were below the contractually required rate. Compl. at

7

¶ 37.  IGT counters that H5G's allegation regarding underpayment of royalties contradicts the position H5G took in a letter attached to the complaint.  On October 6, 2014, H5G acknowledged that IGT had made a royalty payment for the seventeen Co-Developed Games and, "subject to accounting audits in the ordinary course," agreed to remove that issue from the list of alleged contractual breaches under discussion.  *See* Dkt. No. 25-2 at 5.  This admission, according to IGT, is fatal to Count I because documents attached to a complaint trump allegations contained therein when the two are in conflict.  *See Thompson v. Ill. Dep't of Professional Regulation*, 300 F.3d 750, 754 (7th Cir. 2002).

IGT's argument is based on an overreading of H5G's pre-suit correspondence.  To be sure, H5G acknowledged receipt of a royalty payment from IGT in the October 6 letter.  H5G, however, reserved the right to audit the amount received against the amount owed.  IGT says there was no need for an audit because H5G had demanded a sum certain, $2.55 million, in its June 10 letter.  It did not require an audit, in IGT's view, to determine whether its royalty payment satisfied H5G's demand.

The premise of IGT's argument is false.  H5G did not demand a sum certain in its June 10 letter.  Instead, H5G demanded *at least* $2.55 million in "royalty advances" and mentioned the possibility that additional royalties would be owed based on

sales data for each game.  Dkt. No. 25-2 at 1.  Upon receiving IGT's royalty payment, H5G expressly reserved the right to audit that payment against amounts owed.  H5G has effectively revealed the results of that audit in the complaint.  *See* Compl. at ¶ 37 (alleging that IGT failed to pay contractually required advances and that its royalty payment was too low), ¶ 84 (characterizing IGT's payment as a "partial cure").  IGT has not cited a single case for the proposition that acknowledging receipt of a payment subject to an internal audit bars the receipt from later arguing that the payment was too low.

In sum, H5G's pre-suit correspondence does not conflict with its present allegation that IGT has not paid contractually required advances and royalties on the seventeen Co-Developed Games at issue in Count I.  To the extent IGT believes that its royalty payment was sufficient to cure the breach alleged in Count I, that argument can be raised as an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1) (listing "accord and satisfaction" and "payment" as affirmative defenses).

B.

In Counts III and IV, H5G accuses IGT of making forty impermissibly derivative casino games, thirty-one of which are bingo games.  IGT contends that it was contractually authorized to create the thirty-one bingo games at issue in Counts III and IV.

Section 4.1.2(i) of the Agreement provides that "IGT will have the exclusive, worldwide right and license to make, have made, use, offer for sale, sell, import, [any] distribute any Previously Accepted H5G Games within the field of Land-Based Use." The term "Land-Based Use" refers to use on "a gaming machine positioned within a Class II or Class III casino" under Nevada gaming law. Dkt. No. 25-1 at 6. "Class II gaming" is defined as "the game of chance commonly known as bingo." 28 U.S.C. § 2703(7)(A)(i).[1] It follows, according to IGT, that its contractual right to Land-Based Use of Previously Accepted H5G Games necessarily includes the right to make bingo versions of those games." Def.'s Mot. at 9.

IGT's broad interpretation of its right to "make" any previously accepted H5G bingo game would nullify the Agreement's command that IGT shall not "adapt, alter, modify, improve, translate or create any derivative work of any Accepted H5G Game (except to the extent necessary to exercise the rights granted to IGT in Section 4.1.2(iii)." Dkt. No. 25-2 at § 4.3.2.[2] There

---

[1] Although the Agreement references Nevada gaming law, H5G has not challenged IGT's reliance on federal law for the definition of "Class II gaming."

[2] The referenced exception concerns IGT right to incorporate features from previously accepted H5G games into Co-Developed Games. Agreement at § 4.1.2(iii). It is not obvious from the pleadings that any of the thirty-one bingo games at issue in Counts II and III is a Co-Developed Game falling within this exception to the restriction against creating derivative works.

10

is a fine line between (1) performing "technical or development work required to bring...Accepted H5G Game[s] to market," which is IGT's responsibility under the Agreement and (2) creating impermissible derivative versions of those games. *Compare id*. at § 2.4.1 *with* § 4.3.2.

I cannot determine based on the pleadings whether the thirty-one bingo games at issue in Counts II and III are the products of permissible development work or impermissible derivation. Therefore, IGT's motion to dismiss those claims is denied.

C.

In Count VIII, H5G accuses IGT of trademark infringement and seeks treble damages (among other forms of relief).

IGT has moved to strike H5G's prayer for treble damages on the ground that it is contractually barred. Section 12.4 of the Agreement provides:

> In no event will either party be liable for any indirect, incidental, consequential, special, punitive or exemplary damages, including but not limited to loss of profits, loss of data, interruption of service, or loss of business or business opportunity, even if such damages are foreseeable and whether or not such party has been advised of the possibility thereof.

*Id*. at § 12.4. This damages waiver applies without regard to "the form of the claim or cause of action [at issue], whether in

11

contract, warranty, statute, [or] tort (including but not limited to negligence)." *Id*. at § 12.6.

With treble damages seemingly unavailable, H5G seeks refuge in the Agreement's choice of law provision, which says that Nevada law governs all disputes between the parties "supplemented by the laws of the [S]tate of New York where insufficient precedent under case law of Nevada allows for no binding precedent of certain disputed issues, but only to the extent such issues are subject to binding precedent under New York law." *Id*. at § 16.5.

According to H5G, "[t]here is no binding Nevada precedent regarding whether contractual limitations of liability are enforceable with respect to claim for gross negligence or intentional misconduct, so New York law governs the issue." Pl.'s Resp. at 9. New York law provides that "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing." *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983). IGT counters that I need not resort to New York law because Nevada courts clearly enforce contractual limitations on damages unless they are "so one-sided as to oppress or unfairly surprise an innocent party." *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.*, 514 P.2d 654, 657 (Nev. 1973).

The parties have devoted only a few sentences to a complicated choice of law question that will determine whether treble damages are available in this case. The principal case relied upon by each party is not "binding precedent" on this question. The Agreement's limitation on damages does not involve the warranties of merchantability and fitness normally implied in a contract for the sale or lease of goods (as in *Bill Stremmel*) or a limitation on damages caused by delay in a public construction contract (as in *Kalisch-Jarcho*).

Because neither party has cited a "binding precedent" under Nevada or New York law on the enforceability of the Agreement's limitation on damages, I deny IGT's motion to strike without prejudice. If the parties return their attention to this issue at a later stage of this litigation, they should start with a thorough analysis of Nevada contract law and turn to New York law only if Nevada law is indeterminate on the precise question at issue.

D.

H5G's unfair competition claim (Count IX) is based, in part, on IGT's alleged misappropriation of five game trademarks owned by H5G. *See* Am. Compl. at ¶¶ 335-47. The other predicates for H5G's unfair competition claim include IGT's allege trademark infringement and creation of contractually prohibited derivative games. *Id*. at ¶¶ 348-49.

In a recurring theme, IGT takes aim at only a portion of Count IX--namely, H5G's allegations pertaining to trademark misappropriation. IGT contends that H5G has not alleged that it was using the five marks in commerce at the time of the alleged misappropriation; hence, H5G had no property right in the marks and IGT's actions were unlikely to cause consumer confusion. H5G counters that it has plausibly alleged a property right in the marks and consumer confusion even though neither is a required element for unfair competition under Nevada law.

"Nevada common law unfair competition must be 'ground[ed] in deception or appropriation of [the plaintiff's] property.'" *Menalco v. Buchan*, No. 2:07-CV-01178-PMP-PAL, 2010 WL 428911, at *26 (D. Nev. Feb. 1, 2010) (quoting *Golden Nugget, Inc. v. Am. Stock Exch., Inc.*, 828 F.2d 586, 591 (9th Cir.1987)). Therefore, H5G must allege a plausible property interest in the allegedly misappropriated marks or consumer confusion, but not both.

H5G asserts that it "owns" the game trademarks that IGT allegedly misappropriated, but concedes that the marks were for games "under development." Compl. at ¶¶ 72, 335. Nonetheless, H5G contends that I must infer actual use of the marks in commerce based on a bare allegation of ownership. The only case H5G cites in support of this proposition, *Heinermann v. General Motors Corp.*, 342 F. Supp. 203 (N.D. Ill. 1972) (Bauer, J.),

14

rejected an attempt to establish rights in a trademark from something short of actual use in commerce. *Id*. at 207 (holding that a future desire to use a mark does not create a present property interest). In no sense does *Heinermann* compel me to infer from a simple allegation of ownership that H5G actually used the allegedly misappropriated marks in commerce, thereby acquiring a property interest in them. Indeed, the Lanham Act supports the opposite inference: that registration of a mark based on a showing of its actual use in commerce, *see* 15 U.S.C. § 1051(a)(3)(C), gives rise to a rebuttable presumption of valid ownership. *See CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 672-73 (7th Cir. 2001). H5G's attempt to infer use from ownership rather than vice versa turns the Lanham Act on its head.

H5G tacitly concedes that its consumer confusion or deception theory of unfair competition also turns on whether the five marks at issue were actually used in commerce. H5G has not attempted to establish use in commerce from anything other than a bare allegation of ownership. *Heinermann* does not permit me to infer use of a trademark from a simple allegation of ownership. As for H5G's allegation in Paragraph 79 that it used two of the marks after IGT allegedly misappropriated them, such belated use of the marks in commerce does not create property rights. *See Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499 (7th

15

Cir. 1992) ("Under the common law, one must win the race to the marketplace to establish the exclusive right to a mark.").

In sum, H5G's failure to allege actual use in commerce of the five allegedly misappropriated marks is fatal to its unfair competition claim. Without actual use, H5G cannot establish a property interest in the marks or a likelihood of consumer confusion. And without a property interest or consumer confusion, H5G cannot maintain an unfair competition claim under Nevada law based on IGT's alleged misappropriation of trademarks. The portion of Count IX that is not premised on IGT's alleged misappropriation of H5G's marks remains in the case.

E.

In Count X, H5G alleges that IGT has engaged in deceptive trade practices under Nevada law by representing to the public that the derivative games it has created, both before and after H5G terminated the Agreement, are in fact licensed works.

IGT argues that Count X must be dismissed because it sounds in fraud and has not been alleged with sufficient particularity under Rule 9(b), meaning "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Paragraphs 135 through 230 of the complaint, which are incorporated by reference in Count X, chronicle how IGT is

allegedly marketing thirty-one derivative games on its website that were created before H5G terminated the Agreement. Paragraphs 231 through 257 describe nine derivative games created after the Agreement was terminated that IGT is also marketing on its website. All of these allegations are accompanied by screen shots from IGT's website showing a side-by-side comparison between the original and derivative games at issue in Count X. *See* Am. Compl. at Ex. 5.

In light of these detailed allegations, IGT's assertion that it has not been put on notice of the factual basis for H5G's deceptive trade practices claim is disingenuous.

III.

I grant IGT's motion to dismiss only as the portion of Count IX based on trademark misappropriation.

**ENTER ORDER:**

_____
      **Elaine E. Bucklo**
United States District Judge

Dated: October 8, 2015

17